UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISON

In re:                                                Case No.: 9:09-bk-04714-FMD

                                                      Chapter 7

    Rolsafe International, LLC,

        Debtor.

_____/

PNC Bank, N.A., as successor-in-interest
by merger to National City Bank,

        Plaintiff

v.                                                    Adv. Pro. No. 9:09-ap-00142-FMD

Rolsafe International, LLC
Joseph Kafka, as trustee for Tomar
Investment Trust, and Joseph Kafka,
individually

        Defendants.

_____/


**<u>MEMORANDUM OPINION</u>**

**<u>Introduction</u>**

      We hold in this adversary proceeding that the parties entered into a valid, binding, and

enforceable settlement agreement which resolves all of the claims in Plaintiff's Amended

Complaint filed against each of the named Defendants.  In order to understand how the Court

arrived at this ruling, however, a detailed explanation of the parties' relationships with one

another is necessary.  Additionally, because the Court's ultimate conclusion regarding settlement

resolves litigation between non-debtor entities, the Court believes it is necessary to include a

detailed analysis of why it had jurisdiction over this proceeding before providing its findings on the dispositive settlement issue.

With these considerations in mind, the Court has divided its Opinion into three primary sections. Section I explains the factual background and relationship between the parties, as well as the history of the underlying litigation between the parties which has given rise to the causes of action alleged in the instant adversary proceeding. Section II details the facts related to the parties' settlement negotiations and ultimate agreement. Section III contains the Court's legal analysis and is further divided into five subsections.

The Court begins its legal analysis in Section III with a detailed jurisdictional section. In sum, the Court finds that, at a minimum, it had "related to" jurisdiction over all of the claims for relief alleged in the Plaintiff's Complaint and Amended Complaint at the time those pleadings were filed. Because a bankruptcy court's jurisdiction is determined at the time the adversary proceeding commences, and because subsequent events cannot divest the bankruptcy court of jurisdiction once it has properly been exercised, the Court concludes that it had jurisdiction over this proceeding. Further, even though the Court's "related to" jurisdiction appears now to have attenuated upon the occurrence of certain events, the Court concludes, consistent with controlling law, that it has appropriately exercised its discretion to retain jurisdiction over the proceeding. This is so even though the ultimate resolution of this proceeding will arguably not have any conceivable impact on the Debtor's bankruptcy estate.

The Court further concludes that Florida law applies to the determination of the ultimate issue regarding settlement in this case. Florida law recognizes that parties can enter into a valid, binding, and enforceable settlement via email, provided that they have agreed on all essential terms of the settlement. In this case, the parties engaged in settlement negotiations via email,

2

which led to an agreement on the essential terms of a settlement.  Therefore, the Court finds that the parties have entered into an enforceable settlement of all the claims alleged in this proceeding.  Accordingly, the Court will enforce the parties' settlement according to the agreement reached by the parties.  As a result, the Plaintiff's claims will be dismissed.

## I.    Factual Background & Litigation History

The Debtor, Rolsafe International, LLC (" the Debtor"), filed its bankruptcy case on March 13, 2009.  Plaintiff, PNC Bank, N.A., as successor-in-interest to National City Bank ("the Bank"), initiated this adversary proceeding one week later on March 20, 2009 by filing its two-count Complaint against the Debtor and Joseph Kafka, as trustee for Tomar Investment Trust (Doc. No. 1).  The Bank later filed an Amended Complaint (Doc. No. 87) alleging five claims for relief against (i) the Debtor; (ii) Joseph Kafka, as trustee of the Tomar Investment Trust; and (iii) Joseph Kafka, individually.  The first two counts sought the same relief as the initial Complaint, while the remaining counts were added to include Kafka, in his individual capacity, as a defendant.

The Debtor was engaged in the business of designing, manufacturing, and installing hurricane protection systems for homes, condominiums, and commercial buildings.  Tomar Investment Trust ("the Landlord") served as the landlord of the commercial space which the Debtor had leased and occupied to run its business.  Prior to its bankruptcy filing, the Debtor defaulted on rent payments to the Landlord.  As a result, the Landlord commenced an eviction action in state court.  The Landlord eventually obtained an eviction judgment against the Debtor and proceeded to have the local sheriff post a Writ of Possession at the leased premises.  That Writ of Possession required the Debtor to be "all out" of the premises by December 31, 2008.

While the eviction action was pending, the Landlord also filed a separate distress action for unpaid, past-due rent. Although the Landlord later dismissed that suit, during its pendency, the Landlord did obtain a Distress Writ, which ordered the Debtor not to damage, dispose of, conceal, or remove any of its property from the leased premises until such time as the sheriff levied on the property or the writ was vacated. The Debtor filed a motion to vacate the Distress Writ, but that motion was never set for hearing and the state court never resolved that motion prior to the Landlord's dismissal of the case.

Because of the eviction and express terms of the Distress Writ, the Debtor was unable to remove certain of its property from the leased premises. On the basis of an asserted landlord's lien under chapter 83 of the Florida Statutes and the purported abandonment by the Debtor of its property that remained at the leased premises (such property being referred to hereinafter as the "Collateral"), the Landlord utilized Florida's abandoned property statute[1] to dispose of some of the Collateral. Allegedly, the Landlord sold the Collateral to Kafka, one of the defendants in this proceeding, who then allegedly re-sold the Collateral to third parties, including scrap dealers and certain of the Debtor's competitors.

The Bank asserts a competing—and allegedly senior—lien interest in the Collateral and disputes the validity of the Landlord's disposition of the Collateral. In March of 2008, pursuant to a series of loan documents, the Bank created a security interest in virtually all of the Debtor's assets, including the Collateral. After the Debtor defaulted on its obligations to the Bank under the loan documents, the Bank obtained a judgment in the State of Ohio against the Debtor in the amount of $2,134,518.82. When the Debtor filed its bankruptcy petition, the Bank filed its proof of claim in the foregoing amount based on the Ohio judgment. Prior to the petition date, the

---

[1] Fla. Stat. § 715.10, *et seq.*

4

Bank allegedly had been seeking to recover the Collateral, or the proceeds thereof, as part of its security interest in order to reduce the balance on its judgment against the Debtor.

The Bank has at all times asserted a senior lien interest in the Collateral, while the Landlord contends that its landlord's lien under chapter 83 of the Florida Statutes has priority over the Bank's lien. Based on the Bank's asserted senior lien position in the Collateral, the Bank also contends that the Landlord's sale of the Collateral was impermissible and that the sale (and Kafka's subsequent sales to third parties) damaged the Bank by dissipating assets that would have otherwise been available to reduce the balance on its judgment against the Debtor and the amount of its claim against the estate.

Given the competing lien interests in the Collateral, Count I of the Bank's Amended Complaint seeks a determination of the validity, priority, and extent of the various lien interests in the Collateral. Similarly, Count II seeks a declaratory judgment pursuant to Florida Statutes section 86.011 establishing the parties' respective rights in the Collateral.[2] In Counts III, IV, and V, the Bank sued only Kafka, in both his capacity as trustee of the Landlord and individually (collectively, "Kafka"), for conversion, violation of chapter 818 of the Florida Statutes, and conspiracy.

Kafka filed an Amended Answer (Doc. No. 136) to the Amended Complaint, in which he raised settlement as an affirmative defense. Specifically, Kafka contends that during the course of his settlement negotiations with Michael Davis, a former Vice President of the Bank[3] ("Davis"), the Bank offered to settle the causes of action comprising the instant adversary proceeding for a certain sum of money. Kafka further submits that he accepted the Bank's offer,

---

[2] While the Bank named the Debtor as a defendant in Counts I and II, and the Debtor initially filed crossclaims against Kafka, as trustee and individually, the Debtor subsequently resolved its disputes with Kafka and the Landlord, and ultimately filed a notice of voluntary dismissal of those crossclaims (Doc. No. 195).

[3] Davis worked for the Bank for thirty-five years, including over seven years in its special asset division. Davis served as the primary contact at the Bank in connection with the Debtor's loan.

but that the Bank subsequently repudiated its agreement by reneging on its deal and refusing to dismiss this proceeding. The Bank disagrees with Kafka's assertions, arguing instead that no settlement was ever reached because the settlement communications between Kafka and Davis did not include all the essential terms of a settlement. The Bank also argues that Davis lacked the ultimate authority to bind the Bank because any offer Davis made would have been subject to the Bank's completion of its due diligence process and approval by a credit committee pursuant to the Bank's internal operating procedures.

Prior to the final evidentiary hearing which this Court conducted,[4] Kafka filed a motion for summary judgment (Doc. No. 140), in which he re-asserted the position that the parties had reached a settlement, thereby barring the Bank from continuing its suit on the substantive claims for relief. While the Court denied Kafka's summary judgment motion (Doc. No. 153), the order did not completely dispose of the settlement defense or otherwise preclude Kafka from again renewing the arguments raised at the summary judgment stage of this proceeding, including, specifically, whether a settlement between the parties had in fact been reached.

Indeed, the settlement issue remained a live issue at trial, as Kafka continued to pursue the settlement defense as an independent basis on which this Court could adjudicate and resolve the litigation. Both parties presented evidence and argued the law concerning the issue. The Court has now had the additional benefit of hearing Kafka's testimony at trial, as well as reviewing Davis' deposition testimony (Doc. No. 205). After significant deliberation on this issue, reviewing the parties' briefs, and conducting extensive research, the Court is convinced, based on the complete evidentiary record, that the parties reached an enforceable settlement agreement. Therefore, the Court will enforce the settlement reached between the parties. This

---

[4] The trial began with opening statements on January 26, 2012, and continued with witness examination on January 27, 2012. The trial was then continued to April 9 and 10, 2012, and finally concluded on April 13, 2012.

6

opinion is limited to a discussion and analysis of the settlement issue only; it does not propose to resolve the merits of any of the underlying claims for relief alleged in the Bank's Complaint against Kafka, individually, and in his capacity as trustee of the Landlord.

## II. Facts Related to the Settlement Negotiations and Agreement

The alleged settlement communications took place primarily via email between two non-lawyers: Kafka and Davis. The Court admitted into evidence the entire series of emails between Kafka and Davis.[5] In addition to reviewing the email exchanges between Kafka and Davis, the Court also heard testimony from Kafka during the course of the trial. Furthermore, the Court has considered the deposition testimony of Davis, which was offered by the Bank's counsel during trial, and which Kafka's counsel expressly agreed that the Court could consider.[6]

According to Kafka's testimony, his impetus for reaching out to Davis to commence settlement negotiations stemmed from his frustration that he had been embroiled in litigation with the Bank for approximately 18 months (from March 2009 through October 2010) without any visible progress toward resolution. Kafka testified that he was tired of "wasting a lot of money"[7] on attorneys' fees and was hopeful that he and Davis could reach a swifter, more cost effective resolution of the lawsuit. To that end, Kafka flew to Columbus, Ohio (where the Bank's and Davis' offices were located) in early November of 2010 and met with Davis in person to discuss settlement.

Following their face-to-face meeting, Kafka continued the settlement negotiations with Davis via email. On January 5, 2011, Kafka indicated to Davis that he had been trying to reach Davis to discuss a potential settlement of the litigation. In that email, Kafka specifically asked

---

[5] *See* Plaintiff's exhibit # 71 and Defendants' exhibit # 9.
[6] *See* Trial Transcript from April 13, 2012 (Doc. No. 202, p. 74). Mr. Davis did not testify live at the trial. Bank's counsel, however, filed his deposition of record (Doc. No. 205).
[7] *See* Trial Transcript of Kafka Testimony (Doc. No. 200, p. 61).

Davis whether he had "the power to make a deal in this matter."  Davis responded to Kafka on that same day, asking Kafka to make an offer, which Davis would then "run up the flagpole" to see if the litigation could be resolved without the necessity of a trial. Although Kafka expressed some concern about making a settlement offer "in a vacuum," he did ultimately offer to pay the Bank a sum of money to settle the litigation.  On January 14, 2011, Davis responded to Kafka as follows: "our consensus here is your offer is too low at $[redacted], we are willing to settle up at $[redacted]."  Davis testified at his deposition that the first person references to "<u>our</u> consensus" and "<u>we</u> are willing to settle up" meant the Bank, acting through its various officers and agents, including the chief credit officer and in-house counsel.  *See* Davis Deposition Transcript (Doc. No. 205, pp. 57-59).  After receiving the Bank's counteroffer via Davis' email, Kafka replied on January 16, 2011: "we have the makings of a deal.  Let's finalize Monday."

On January 18, 2011, Kafka and Davis had further discussions via telephone.  Kafka testified at trial that he called Davis and accepted the Bank's counteroffer. *See* Trial Transcript (Doc. No. 200, p. 62). Kafka further testified that Davis agreed that a settlement had been reached.  *See id.*  Moreover, the following day, on January 19, 2011, Kafka sent Davis an email stating: "<u>confirming our conversation of yesterday</u>, we have agreed to settle the <u>entire</u> matter for the $[redacted] you proposed.  Just checked my email for today at 4 pm and had no email concerning the documents for me to review and sign and forward to you with the check.  <u>As discussed</u>, I think it will just involve a withdrawal of the complaint to the court and a release for us to sign.  The release I need to have reviewed by my attorney before I sign.  Please stay on your attorney so we can proceed promptly as discussed." (emphasis supplied).

The very next day, Kafka again followed up with Davis, asking that he "please provide an estimate of when the paperwork moves."  Davis responded that the Bank's in-house counsel

8

was out of the office on that date, but that Davis would "get a fix tomorrow." After four more days passed without any further communications, Kafka again inquired on January 24, 2011 as to the status of the paperwork. Davis indicated that he would be talking to his attorney that same afternoon. Apparently, though, Davis never followed up with Kafka, because on January 26, 2011, Kafka again sent an email to Davis asking for an update on the progress and timing of the settlement papers. Receiving no response, Kafka sent another email the following day, again requesting an update and reiterating what, in his mind, was a very simple settlement agreement. "While not a lawyer, I don't think this matter takes anything but your letter to the court dropping the complaint and a release signed for receipt of the settlement money."

On January 28, 2011, Davis responded: "they are finishing the due diligence, it's taking longer than expected." Apparently confused by the first-time reference to due diligence, Kafka replied to Davis that same afternoon, inquiring as to what due diligence was being performed, who the "they" was who was performing it, and when the due diligence would be completed. Davis testified at his deposition that it was the Bank's policy to conduct due diligence once an offer to settle was made. *See* Doc. No. 205, p. 64 ("usually when an offer is made, that's when we do our due diligence on it"). After inquiring about the due diligence, and after failing to receive a response from Davis, Kafka sent a follow-up email to Davis on January 31, 2011, asking Davis if he could "spare a couple of minutes and let me know what's going on regarding finalizing our agreement?"[8] One week later, on February 7, 2011, Kafka expressed his frustration to Davis that he had still not received a response to his last inquiry, noting that "weeks have gone by with no follow on paperwork and settlement as I have been expecting." On February 11, 2011, Davis finally concluded the email exchange with Kafka, informing Kafka

---

[8] While this email from Kafka is the last email contained in Plaintiff's Exhibit # 71, additional emails were exchanged, which explain how the settlement discussions ended. *See* Defendants' Exhibit # 9.

"that after conducting our due diligence, we cannot settle these disputes at this time." Davis directed any further correspondence to the Bank's lawyers, and he and Kafka did not exchange any further emails.

### III. Legal Analysis

#### A. Jurisdiction & "Coreness" of Proceeding

##### 1. General Principles of Bankruptcy Court Jurisdiction

Bankruptcy courts derive their original jurisdiction from 28 U.S.C. § 1334. Under 28 U.S.C. § 1334(a), Congress has conferred original and exclusive jurisdiction of all cases under title 11 to the district courts. Additionally, pursuant to 28 U.S.C. § 1334(b), Congress has conferred original jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11, to the district courts. The district courts have, in turn, referred all cases under title 11 and all proceedings arising under title 11, or arising in or related to cases under title 11, to the bankruptcy courts. Such referral is authorized by 28 U.S.C. § 157(a) and implemented by the Standing Order of General Reference[9] that has been issued in each federal judicial district.

Accordingly, bankruptcy courts, as units of the district courts, have jurisdiction over four types of bankruptcy cases and proceedings: (i) cases under title 11; (ii) civil proceedings "arising under" title 11; (iii) civil proceedings "arising in" a case under title 11; and (iv) civil proceedings that are "related to" a case under title 11. As is apparent from the text of § 1334, there is a

---

[9] *See In re Standing Order of Reference Case Arising Under Title 11, United States Code*, Case No. 6:12-mc-26-ORL-22 ("any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for this district"). Chief District Judge Conway entered the Standing Order on February 22, 2012, amending and superseding the previous 1984 Standing Order of Reference entered by Judge Hodges. While entered in Orlando and bearing an Orlando caption, the current Standing Order of Reference applies to the entire Middle District of Florida, including the Fort Myers Division.

difference between a "case" and a "proceeding." A "case under title 11" is simply the main bankruptcy case that commences when the bankruptcy petition is filed. *Matter of Wood*, 825 F.2d 90, 93 (5th Cir. 1987). During the pendency of that main case, various other "civil proceedings" arise. These "civil proceedings" include "adversary proceedings" and "contested matters." They are the types of "civil proceedings" referred to in the remaining three categories of matters over which bankruptcy courts have jurisdiction. They are often referred to from a jurisdictional perspective simply as "arising under," "arising in," and "related to" proceedings.

"Arising under" proceedings are those that involve a cause of action created or determined by a statutory provision of title 11. *In re Williams*, 244 B.R. 858, 864 n. 7 (S.D. Ga. 2000), *aff'd*, 34 Fed. Appx. 967 (11th Cir. 2002). "Arising in" proceedings are those involving certain types of administrative matters that arise only in a bankruptcy case and have no existence outside of bankruptcy. *Id.* Finally, "related to" proceedings are those involving claims or causes of action, the outcome of which "could conceivably have any effect on the estate being administered in bankruptcy." *See In re Lemco Gypsum, Inc.*, 910 F.2d 784, 788 (11th Cir. 1990) (adopting the formulation of "related to" jurisdiction originally articulated in *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

The "related to" test is obviously very broad; indeed, the proceeding need not necessarily be against the debtor or the debtor's property. *In re Lemco Gypsum*, 910 F.2d at 788; *In re Phoenix Diversified Inv. Corp.*, 439 B.R. 231 (Bankr. S.D. Fla. 2010). Rather, the outcome of the proceeding in question need only have a <u>conceivable</u> effect on the debtor's estate. A conceivable effect includes the alteration of the debtor's rights, liabilities, options, or freedom of action, as well as any impact on the handling or administration of the debtor's estate. *In re Lemco Gypsum*, 910 F.2d at 788. *See also In re Toledo*, 170 F.3d 1340, 1345 (11th Cir. 1999)

11

(noting that the key word "conceivable" in the *Pacor* and *Lemco Gypsum* tests makes the jurisdictional grant "extremely broad").

As a practical matter, it is unnecessary to distinguish between the various standards of bankruptcy jurisdiction in any given proceeding because they operate conjunctively to define the scope of a bankruptcy court's jurisdiction. *Matter of Wood*, 825 F.2d at 93. As long as one standard is met, the bankruptcy court has jurisdiction. Thus, because the "related to" standard is the broadest—requiring simply that there be a conceivable effect on the estate—it is only necessary to determine whether a proceeding is at least "related to" the bankruptcy. *Id.*

### 2.  *Time for Evaluation of Court's Jurisdiction*

It is important to understand, particularly in this case, that a bankruptcy court's "related to" jurisdiction is tested at the time it is invoked. *In re Canion*, 196 F.3d 579, 587 n. 29 (5th Cir. 1999) (citing *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 111 S. Ct. 858 (1991)); *In re New York Skyline, Inc.*, 471 B.R. 69, 78 (Bankr. S.D.N.Y. 2012) ("[a] court's subject matter jurisdiction is determined at the time that the action is commenced, and subsequent events do not affect it."). That means that the conceivable effect on the estate is ascertained at the time the adversary complaint is filed—not at some later time when subsequent events have transpired which prevent the conceivable effect from actually materializing. *See In re Toledo*, 170 F.3d at 1346, n. 8 ("The presence or absence of jurisdiction must be evaluated based on the state of affairs existing at the time the adversary complaint was filed ... not at some later time when, for example, it was ultimately determined here that the Estate had no interest in the [matter]."); *In re Canion*, 196 F.3d at 586-87 (noting that while the sequence of events that would have reduced the creditor's claims against the debtor's bankruptcy estate was not certain

to occur at the time the adversary proceeding was referred to the bankruptcy court, the law is well established that, when testing "related to" jurisdiction, an effect is not required to a certainty).

As noted in the foregoing cases, the court is not divested of jurisdiction due to subsequent changes in events. *See In re Toledo*, 170 F.3d at 1346, n. 8; *In re Canion*, 196 F.3d at 587, n. 29; *In re B.J. McAdams, Inc.*, 66 F.3d 931, 936 (8th Cir. 1995) ("jurisdiction will not retroactively evaporate at the conclusion of a proceeding in which the bankruptcy court ascertains that the property of the estate is insufficient to satisfy all valid liens in full"); *In re New York Skyline*, 471 B.R. at 79 (noting that at the time the adversary proceeding was commenced in bankruptcy court, the claims were within the court's "related to" jurisdiction and that neither the subsequent confirmation of the debtor's plan nor anything else that subsequently occurred deprived the court of its subject matter jurisdiction over those claims).

These legal precepts must be kept in mind because, often times, as an adversary proceeding unfolds, it may appear that a bankruptcy court's ultimate resolution of the issues has no effect—either conceivable or actual—on the estate.  Jurisdiction, however, is not determined with the benefit of hindsight or through a retroactive lens.  As noted in the foregoing cases, events that transpire subsequent to the filing of the adversary complaint cannot serve to divest a bankruptcy court of jurisdiction.  In fact, there is ample—and controlling—authority holding that even where the debtor's main bankruptcy case is dismissed, the court is not necessarily divested of jurisdiction over a pending adversary proceeding that was filed within the main case.  *See, e.g., In re Morris*, 950 F.2d 1531, 1534 (11th Cir. 1992) (concluding that "the dismissal of an underlying bankruptcy case does not automatically strip a federal court of jurisdiction over an adversary proceeding which was related to the bankruptcy case at the time of its

commencement"); *In re New York Skyline*, 471 B.R. at 78 ("[e]ven the dismissal of the underlying bankruptcy case does not automatically deprive the bankruptcy court of jurisdiction to determine pending matters").   Courts have also reached the same conclusion where the underlying case has not yet been dismissed or closed.  *See, e.g., In re Blasingame*, 2012 WL 2064417, *5 (Bankr. W.D. Tenn. June 7, 2012).

In such situations where it appears, based on the occurrence of subsequent events, that the pending adversary claims would no longer have a conceivable effect on the estate, the decision whether to retain jurisdiction over the pending claims and adversary proceeding is left to the sound discretion of the bankruptcy court.  *In re Morris*, 950 F.2d at 1534.  The decision is guided by consideration of the following factors: (i) judicial economy; (ii) fairness and convenience to the litigants; and (iii) the degree of difficulty of the related legal issues involved.  *Id.* at 1535. *See also In re Blasingame*, 2012 WL 2064417, at *5 (analyzing the same factors in deciding whether to retain jurisdiction over an adversary proceeding where "as the result of changed circumstances, there is no longer federal bankruptcy jurisdiction over the adversary proceeding notwithstanding the fact that the bankruptcy case remains open").

### 3. *The Court's Jurisdiction in this Adversary Proceeding*

In this proceeding, the Court clearly had "related to" jurisdiction over the Bank's claims for relief at the time the Complaint and Amended Complaint were filed.  Furthermore, while it may appear now based on subsequent events (i.e., confirmation of the Debtor's plan and the Debtor's dismissal of its crossclaims against Kafka) that there is no longer a conceivable effect on the estate, the Court, in its sound discretion, has decided to retain jurisdiction over this proceeding.

a.   The Court's "Related To" Jurisdiction at the Time the Proceeding Commenced

Count I of the Bank's Complaint seeks a determination of the validity, extent, and priority of the competing liens in the Collateral.  The Bank also asks the Court to require the Landlord to account to the Bank for the Collateral and proceeds of the same.  This relief is—at a minimum—"related to" the Debtor's bankruptcy case because of the conceivable effect on the estate at the time the Complaint was filed.

In the Debtor's main bankruptcy case, the Bank filed a proof of claim based on the Ohio judgment for $2,134,518.82.  If the Bank prevailed on Count I, and this Court ordered the Landlord to account to the Bank for the proceeds of the Collateral, the Bank's claim against the estate would be impacted because the claim would have to be adjusted to reflect receipt of the proceeds. Similarly, if the Court adjudged the Bank's lien to be superior to the Landlord's lien, then the Landlord's sale of the Collateral would have resulted in the wrongful disposition of the Bank's Collateral.  The Bank would be entitled to seek and recover damages (as it is attempting to do in this proceeding) from the Landlord for the value of the wrongfully disposed of Collateral.  Any such recovery would then be applied toward the satisfaction of its judgment against the Debtor and would reduce its claim against the estate in a corresponding amount. Simply put, it was conceivable at the time the Complaint was filed that the relief sought by the Bank could impact the estate.

It is well established that a creditor must apply any recovery from a non-debtor third party to reduce its claim against the debtor and the estate, lest there be an impermissible windfall or double recovery on the part of the prevailing creditor.  *See Johnson v. Fifth Third Bank, Inc.*, 2012 WL 1906376, *6 (W.D. Ky. May 25, 2012) (holding that a plaintiff's suit against a third

party for recovery of the value of its collateral must result in a corresponding reduction to the plaintiff's claim against the estate).  The potential for such a reduction constitutes a conceivable effect on the bankrupt debtor's estate sufficient to fall within the court's "related to" jurisdiction. *Id.  See also Omega Tool Corp. v. Alix Partners, LLP*, 416 B.R. 315, 320 (E.D. Mich. 2009) (noting that courts have "routinely held that a case between two non-debtor parties is 'related to' a bankruptcy proceeding when, for example, the outcome of the case may increase or decrease claims against the debtor"); *In re Canion*, 196 F.3d at 586, n. 28 (stating that "a claim between two non-debtors that will potentially reduce the bankruptcy estate's liabilities produces an effect on the estate sufficient to confer 'related to' jurisdiction" and citing a number of other circuit court decisions for the same proposition).  Because of the conceivable effect Count I of the Bank's Complaint may have on the estate, the Court has jurisdiction over that claim.  *See In re Toledo*, 170 F.3d at 1346 ("A conceivable effect on the Estate thus exists in the possible partial satisfaction and consequent downward adjustment of the claim filed against the Estate by the Bank.").

For the reasons explained above, the Court also has "related to" jurisdiction over the remaining counts of the Bank's Complaint.  Count II seeks a declaratory judgment under Florida Statutes section 86.011 as to the competing lien interests in the Collateral.  The relief sought is essentially the state law counterpart to the federal bankruptcy 28 U.S.C. § 157(b)(2)(K) proceeding alleged in Count I.  Counts III, IV, and V all seek money damages against Kafka for the alleged wrongful sale and disposition of the Collateral.  As previously noted in the above discussion, any recovery obtained under those counts would have to be applied toward the reduction of the Bank's claim against the Debtor's estate.  Accordingly, because the outcome of

the adversary proceeding would impact the administration of the estate, the Court had "related to" jurisdiction over all of the Bank's claims at the time its jurisdiction was tested.

b. The Court's Decision to Retain Jurisdiction

As explained, a bankruptcy court's jurisdiction does not disappear due to the occurrence of subsequent events.  Thus, even where it may appear that the bankruptcy court lacks jurisdiction because the "related to" nexus to the debtor's main case has ceased to exist and there is no longer a conceivable effect on the estate, the bankruptcy court may nevertheless choose to retain jurisdiction over a pending adversary proceeding.  *In re Morris*, 950 F.2d 1531 (11th Cir. 1992).

In this proceeding, subsequent events have occurred that arguably make any impact on the Debtor's estate non-existent.  For example, the Debtor, who was named as a defendant in Counts I and II of the Bank's Amended Complaint, had filed crossclaims against Kafka.  Those crossclaims, however, were dismissed on April 5, 2012, well after the trial on the Bank's claims for relief had commenced on January 12, 2012, but before the trial resumed on April 9, 2012, following a three month recess.  Furthermore, the Debtor's plan of reorganization has been confirmed, and the ultimate outcome of the Bank's claims against Kafka will not affect the treatment that either the Bank or Kafka will receive under the terms of the confirmed plan.  Nevertheless, the Bank's claims against Kafka remain pending and must be adjudicated by some tribunal.

Notwithstanding the arguable absence of a conceivable effect on the estate because of the occurrence of the events described above, the Court concludes that it is a proper exercise of its discretion to resolve the litigation between the Bank and Kafka.  In reaching this conclusion, the

Court has considered the *Morris* factors of (i) judicial economy; (ii) fairness and convenience to the litigants; and (iii) the degree of difficulty of the legal issues involved. The Court finds that the first two factors heavily outweigh the third and militate in favor of retaining jurisdiction to resolve the adversary proceeding.

Judicial economy would best be served by this Court adjudicating the Bank's claims. This adversary proceeding has been pending since March of 2009, and the parties and their counsel have spent considerable energy, time, and money litigating the claims in this forum before three different bankruptcy judges, all of whom have made substantive rulings in the case. This Court is well-versed in the issues and indeed has already conducted a five-day trial on the claims. *See In re Morris*, 950 F.2d at 1535 (noting that the bankruptcy court did not abuse its discretion in retaining jurisdiction over the pending adversary proceeding where it had been pending for over four years and was ready for trial). Both parties would incur significant cost if they were forced to re-litigate the same issues in state court. It would also be unfair, inconvenient, and a waste of time for the parties to re-litigate the same claims in another forum when all of the issues have already been briefed and tried. Finally, the underlying facts are of considerable complexity, and it would be rather inefficient to ask a state court to familiarize itself with those facts and the attendant legal issues when this Court is prepared to rule. Accordingly, the Court has elected to retain jurisdiction over the Bank's claims against Kafka.

A final word on the Court's actual resolution of the litigation is appropriate at this point. As explained more fully below, the Court's ruling is that the Bank and Kafka reached an enforceable settlement agreement resolving the Bank's claims in this adversary proceeding. It is, therefore, unnecessary to render an actual determination as to whose lien—the Bank's or the Landlord's—in the Collateral was superior. Likewise, it is also unnecessary to adjudge the

merits of the Bank's remaining state law claims, particularly Counts III, IV and V of the Amended Complaint, which seek monetary relief against Kafka for the alleged conversion and wrongful sale of its Collateral.  The finding of settlement is dispositive.  While that finding is not the basis for the initial conferral of jurisdiction on the Court, it is the result of the Court's initial exercise and continued retention of its jurisdiction.[10]

### 4.   Designation of a Proceeding as "Core" or "Non-Core"

A distinct inquiry from the bankruptcy court's jurisdiction concerns whether the proceeding involves claims that are "core" or "non-core." This determination impacts whether the bankruptcy court, as an Article I tribunal, has the constitutional authority to enter a final order or judgment on a particular claim, or whether the court must instead submit proposed findings of fact and conclusions of law to the Article III district court, which would then enter a final order or judgment.  Following the United States Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S. Ct. 2858 (1982), Congress enacted 28 U.S.C. § 157, which creates a dichotomy under which proceedings are

---

[10] It is worth reiterating that subsequent events that occur during the course of a pending adversary proceeding do not divest the court of jurisdiction.  Thus, the fact that the Bank and Kafka engaged in settlement negotiations nearly two years after this proceeding was initiated, which ultimately led to a settlement and a valid affirmative defense as asserted by Kafka, does not retroactively render the Court's jurisdiction non-existent.  *See In re Canion*, 196 F.3d at 587, n. 29 (stating that subsequent events will not divest the court of jurisdiction); *cf. Dean Forwarding Co., Inc. v. U.S.*, 2 Cl. Ct. 559, 564 (1983) ("It has long been the rule of the federal courts that jurisdiction is determined at the time the suit is filed and is not subject to manipulation by subsequent events.  The jurisdiction of this court depends upon the state of things at the time the action is brought; after vesting, it cannot be ousted by subsequent events."); *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 292 58 S. Ct. 586, 592 (1938) (holding that the court was not divested of jurisdiction in a diversity suit even though subsequent events led to a reduction in the plaintiff's claim below the threshold, requisite jurisdictional amount in controversy).  The Court's ultimate holding in this case (i.e., that an enforceable settlement exists) is the end result of the Court's proper exercise of its jurisdiction.  That one party may not agree with the ultimate holding at this juncture does not mean that the Court lacked jurisdiction to render the holding in the first place.  In sum, the Court's jurisdiction has not evaporated on account of a dispositive affirmative defense having materialized during the pendency of this proceeding.

classified either as "core" or "non-core."  Absent consent of the parties, bankruptcy courts can only enter final orders or judgments in "core" proceedings.

Specifically, 28 U.S.C. § 157(b)(1) permits bankruptcy judges to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11."  In 28 U.S.C. § 157(b)(2), Congress provided a non-exhaustive list of proceedings that are deemed to be "core" proceedings.  *See* 28 U.S.C. § 157(b)(2)(A)-(P).  If a proceeding is not core, then it is "non-core."  Non-core proceedings may nevertheless be "related to" the bankruptcy case.  In such non-core but related to proceedings, bankruptcy courts may still hear (i.e., preside over) the proceeding.  But, instead of entering final orders or judgments as is allowed in core proceedings, bankruptcy courts are required, absent consent of the parties, to submit proposed findings of fact and conclusions of law to the district court.  *See* 28 U.S.C. § 157(c)(1).  The district court then enters the final order or judgment after conducting a *de novo* review of the bankruptcy judge's proposed findings and conclusions. *Id.*  If the parties consent, however, the bankruptcy court can enter a final order or judgment without having to submit proposed findings and conclusions, and the judgment will be subject to a more deferential standard of review under § 158.  *See* 28 U.S.C. § 157(c)(2).

In sum, the purpose of the "core" and "non-core" dichotomy is to facilitate a determination regarding the bankruptcy court's constitutional authority to enter a final order or judgment on a given claim.  Thus, the designation of a claim as "core" or "non-core" is separate from the issue of whether the bankruptcy court even has subject matter jurisdiction in the first place.  *See, e.g., In re Royal*, 197 B.R. 341, 348 (Bankr. N.D. Ala. 1996) ("Designation of a proceeding as "core" relates to whether it is due to be heard in an Article III court rather than in

an Article I court and has no relevance to the issue of whether or not subject matter jurisdiction exists in the federal courts").

While courts occasionally refer to "core jurisdiction,"[11] such a reference technically constitutes a blending of the concepts of jurisdiction and the core and non-core dichotomy. Nevertheless, the Eleventh Circuit has stated that core proceedings are, by definition, within the bankruptcy court's jurisdiction. *In re Toledo*, 170 F.3d at 1345, n. 6 ("Although whether something is a core proceeding is analytically separate from whether there is jurisdiction, by definition all core proceedings are within the bankruptcy court's jurisdiction."); *see also In re Royal*, 197 B.R. at 347 (noting that while it is generally, if not always, true that a core proceeding is within the bankruptcy court's jurisdiction, parties should not use the term "core proceeding" interchangeably with "arising under" or "arising in" jurisdiction).

### 5. The "Coreness" of the Claims in this Proceeding

The Court now turns to the "coreness" of the claims pled in the Amended Complaint to determine whether it may enter a final order or judgment, or, instead, whether it must submit proposed findings of fact and conclusions of law to the district court. Count I of the Bank's Amended Complaint seeks a determination of the priority, extent, and validity of the competing liens in the Debtor's Collateral: a classic core proceeding under 28 U.S.C. § 157(b)(2)(K). *See also In re Schultz*, 161 Fed. Appx. 653 (9th Cir. 2005) (stating that where a party seeks to establish the validity and priority of its lien rights, the claim falls squarely within the meaning of a core proceeding under 28 U.S.C. § 157(b)(2)(K)). Accordingly, the Court may enter a final order on Count I.

---

[11] *See, e.g., In re Toledo*, 170 F.3d at 1345 (noting that the district court below held that the bankruptcy court had jurisdiction because the dispute was a "core proceeding").

The remaining counts, however, appear to be non-core, as they all involve state law claims which could be maintained outside of the Debtor's bankruptcy.    Nevertheless, the Court concludes that it may still enter final judgment on each claim under 28 U.S.C. § 157(c)(2) because the parties have consented to this Court hearing and determining each cause of action alleged in the Bank's Amended Complaint.    *See* Doc. No. 162 (Kafka's Trial Brief, p. 2 – relying on settlement; and p. 3, § C(e) – consenting to jurisdiction[12]) and Doc. No. 163 (Bank's Trial Brief, p. 18 – consenting to jurisdiction).    A bankruptcy court may enter a final order or judgment in a non-core proceeding where the parties have consented in accordance with 28 U.S.C. § 157(c)(2).    *Stern v. Marshall*, 131 S. Ct. 2594, 2607 (2011) (citing 28 U.S.C. § 157(c)(2) for the proposition that "parties may consent to entry of final judgment by [a] bankruptcy judge in [a] non-core case"); *In re Safety Harbor Resort & Spa*, 456 B.R. 703, 705 (Bankr. M.D. Fla. 2011) (Williamson, J.) ("parties can still consent—either expressly or impliedly—to a bankruptcy court's [adjudication of non-core proceedings] after *Stern*"); *In re Old Cutters, Inc.* 2012 WL 2277837, *7 (Bankr. D. Idaho June 18, 2012) ("Even if the adversary proceedings were merely 'related to' [the Debtor's] bankruptcy case, which at a minimum, no doubt, these adversary proceedings are, this Court has statutory and constitutional authority to enter a final judgment 'with the consent of all the parties to the proceeding.'"); *see also In re Davis*, 899 F.2d 1136, 1141-42 (11th Cir. 1990).    Here, the Court finds that the parties expressly consented to this Court hearing and determining all of the claims and defenses asserted in the

---

[12] While the text of Kafka's trial brief states that Defendants consent to "liability," it is clear that such statement was meant to refer to "jurisdiction," as the section corresponds to the Court's Order Scheduling Final Evidentiary Hearing (Doc. No. 151, p. 3, § 4(C)(e)).

adversary proceeding. Accordingly, the Court has statutory and constitutional authority to enter a final judgment. [13]

### B.  <u>Authority to Enforce the Settlement</u>

Having concluded that it appropriately exercised jurisdiction over this proceeding and that it may enter a final order or judgment on all of the Bank's claims, the Court finally turns to the actual resolution of the litigation. As alluded to above and discussed more fully below, the Court finds that the Bank and Kafka entered into an enforceable settlement of the Bank's claims. This Court possesses the inherent authority to summarily enforce a settlement agreement entered into by parties litigant in a pending case. *Ford v. Citizens & Southern Nat'l Bank*, 928 F.2d 1118, 1121 (11th Cir. 1991). This adversary proceeding has been pending since 2009, and Kafka and the Bank commenced their settlement negotiations in early January, 2011. Thus, upon a finding that an enforceable settlement agreement was reached, this Court may enforce it. Furthermore, courts have recognized the bankruptcy court's power to enforce settlement agreements under § 105, which allows the bankruptcy court to issue a decree of specific performance of a contract. *In re Stokes*, 198 B.R. 168, 175 (E.D. Va. 1996); *In re Hillsborough Holdings Corp.*, 267 B.R. 882, 889 (Bankr. M.D. Fla. 2001). The burden rests with the party seeking judgment on the basis of compromise or settlement to establish by a preponderance of the evidence that the opposing party has assented. *Ponce v. U-Haul Co. of Florida*, 979 So. 2d 380 (Fla. 4th DCA 2008).

---

[13] To the extent that in review, the district court disagrees with our conclusion that the parties voluntarily and knowingly consented to have a bankruptcy judge hear and determine claims which the district court deems non-core, this Court respectfully submits this memorandum opinion as containing its proposed findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure and the Standing Order of Reference.

C. **Governing Law**

State law governs the validity and enforceability of settlement agreements. *Burke v. Smith*, 252 F.3d 1260, 1266 (11th Cir. 2001). Because the negotiations that led to the settlement occurred via email and over the telephone between two individuals located in different states (Florida and Ohio), the Court must determine which state's law concerning settlement applies. Both Florida and Ohio law recognize the legal principle that absent a choice of law provision, a contract, including issues as to its validity, is governed by the law of the state where the contract is made. *Nationwide Mut. Inso. Co. v. Ferrin*, 487 N.E. 2d 568 (Ohio 1986); *Alropa Corp. v. Kirchwehm*, 33 N.E. 2d 655 (Ohio 1941); *Fioretti v. Massachusetts General Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995); *Pastor v. Union Cent. Life Ins. Co.*, 184 F. Supp. 2d 1301, 1305 (S.D. Fla. 2002). A contract is made where the last act necessary to complete the contract occurs. *Pipe Welding Supply Co. v. Gas Atmospheres, Inc.*, 201 F. Supp. 191 (N.D. Ohio 1961); *Fioretti*, 53 F.3d at 1235; *Pastor*, 184 F. Supp. 2d at 1305. The last act necessary to complete a contract is the offeree's communication of acceptance to the offeror. *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1093 (11th Cir. 2004); *Evans v. Occidental Life Ins. Co. of North Carolina*, 455 N.E. 2d 678, 682 (Ohio App. 1982). Thus, the law of the state in which the acceptance was communicated will control.

In cases involving interstate communications, the location of acceptance is the place where the acceptor speaks or otherwise completes his manifestation of assent. Restatement (Second) of Contracts § 64, cmt. (c) (1981). This rule encompasses communications made via telephone and teletype, including email. *Id.* Because Kafka stated his acceptance of the Bank's counteroffer to Davis by phone on January 18 and by email on January 19, he manifested his

assent to and communicated his acceptance of the counteroffer in Florida. Thus, Florida law governs this dispute.[14]

### D. General Principles of Contract Law

The determination of whether parties have entered into a binding settlement agreement is governed by the general principles of contract law. *Schwartz v. Florida Bd. of Regents*, 807 F.2d 901, 905 (11th Cir. 1987). Thus, there must be an offer, acceptance, and consideration, as well as a meeting of the mind on all essential terms. *See Don L. Tullis & Associates, Inc. v. Benge*, 473 So. 2d 1384, 1386 (Fla. 1st DCA 1985) (noting that in order for a settlement agreement to be enforced, it must be "sufficiently specific and mutually agreeable on every essential element").

Florida law is clear that a settlement can be reached through a series of email exchanges. *See Warrior Creek Development, Inc. v. Cummings*, 56 So. 3d 915 (Fla. 2d DCA 2011). Federal courts within the Eleventh Circuit have likewise held that a binding settlement agreement can be reached via email. *See, e.g., Miles v. Northwestern Mutual Life Ins. Co.*, 677 F. Supp. 2d 1312 (M.D. Fla. 2009); *Terra-ADI Int'l Dadeland, LLC v. Zurich American Ins. Co.*, 2007 WL 2460744 (S.D. Fla. Aug. 24, 2007); *Jarvis v. City Electric Supply Co.*, 2012 WL 933057 (M.D. Fla. Mar 5, 2012).

Parties can expressly require the terms of the settlement to be memorialized in a formal document and executed by the parties in order to be enforceable. But there is no legal requirement that they do so. *Contrast Club Eden Roc, Inc. v. Tripmasters, Inc.*, 471 So. 2d 1322,

---

[14] The Court also reaches the conclusion that Florida law applies based on the "diversity jurisdiction approach." *See, e.g., In re Friedlander Capital Management Corp.*, 411 B.R. 434, 441-42 (Bankr. S.D. Fla. 2009). Even though bankruptcy courts do not sit in diversity jurisdiction, they may nevertheless "borrow from the law applicable in diversity cases to hold that the forum state's choice of law rules are imposed on bankruptcy adjudications where the underlying rights and obligations are defined by state law." *Id.* Thus, because the instant adversary proceeding is pending in Florida, Florida's choice of law rules would determine the applicable state law for the Court's settlement analysis. As explained above, Florida's choice of law rules result in the application of Florida law.

1324 (Fla. 3d DCA 1985) ("Where the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time.") and *Long Term Management, Inc. v. University Nursing Care Center, Inc.*, 704 So. 2d 669, 674 (Fla. 1st DCA 1997) (finding that the parties did not intend for a settlement to be binding until it was reduced to writing and executed by the parties, based on counsel's comments to the court that the settlement was "subject to [being written] down") *to Miles*, 677 F. Supp. 2d at 1316 (holding that even though the settlement email contemplated a formal agreement fleshing out the essential terms contained within the email, there was no evidence that the parties did not intend to be bound by the terms recited in the email until and unless the more formal agreement was executed) and *Vital Pharmaceuticals, Inc. v. S.A.N. Nutrition Corp.*, 2007 WL 1655421, *7 (S.D. Fla. June 6, 2007) (noting that "no objective evidence in the record provides any indication whatsoever that the parties did not intend to be bound until the agreement was written down and fully executed").

In fact, settlements may exist and be enforced even though they are not signed by the parties, or even reduced to writing at all. *See Vital Pharmaceuticals*, 2007 WL 1655421, at *6 ("Execution of the settlement agreement is not a condition precedent to a settlement agreement, but rather is merely a procedural formality."); *Bonagura v. Home Depot*, 991 So. 2d 902 (Fla. 1st DCA 2008) (holding that the parties reached a valid, binding oral settlement agreement without contingencies); *Boyko v. Ilardi*, 613 So. 2d 103 (Fla. 3d DCA 1991) (finding that the parties entered into a binding oral settlement agreement which was expressly agreed to by both parties).

In this case, as in *Miles* and *Vital Pharmaceuticals*, there is no evidence that the parties conditioned the settlement on the execution of a formal written settlement agreement. For example, there is no email from Davis to Kafka indicating that the Bank did not intend to be

bound by its settlement offer unless Kafka signed a written settlement agreement. Thus, the absence of a formalized, written settlement agreement executed by both the Bank and Kafka is not a barrier to the Court's ability to find that a settlement was actually reached. *See Patrick v. Christian Radio*, 745 So. 2d 578, 580 (Fla. 5th DCA 1999) (holding that settlement was effective even though certain executory documents had not yet been executed). Similarly, the fact that Kafka never actually transferred the agreed-upon sum to the Bank is not an issue because "there is no requirement that settlement monies actually be transferred in order to find a particular settlement agreement is binding and enforceable." *State Farm Mut. Auto Ins. Co. v. InterAmerican Car rental, Inc.*, 781 So. 2d 500, 502 (Fla. 3d DCA 2001); *see also Patrick v. Christina Radio*, 745 So. 2d at 581 (acknowledging that the actual transfer of settlement monies is not a prerequisite to the court's finding of a binding, enforceable settlement).

The foregoing legal principles guide courts in fulfilling the important policy of enforcing settlements whenever possible: a policy to which both the Florida Supreme Court and the Eleventh Circuit Court of Appeals adhere. *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985); *Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1486 (11th Cir. 1994). Because settlement is a highly favored means of dispute resolution, this Court will enforce the settlement between Kafka and the Bank if possible (i.e., if the parties agreed on the essential terms of the settlement).

### E.  The "Essential" Terms of the Settlement

Courts may only enforce a settlement agreement if a valid, binding agreement exists in the first place. In order for a settlement agreement to exist, the parties must have agreed on all essential terms. *Spiegel v. H. Allen Holmes, Inc.*, 834 So. 2d 295, 297 (Fla. 4th DCA 2003).

However, uncertainty as to non-essential terms or small items will not preclude the enforcement of a settlement agreement.  *Id.*  Stated differently, a settlement will be enforced if it is sufficiently capable of implementation.  *In re Sav-A-Stop Inc.*, 124 B.R. 356, 359 (Bankr. M.D. Fla. 1991).

   That the parties must agree on all essential terms, of course, begs the question what is an "essential" term, as contrasted to a non-essential term.  Florida law is not particularly helpful on this issue, as the cases are legion in reciting the general—and generally unhelpful—proposition that "what constitutes an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis."  *See, e.g., ABC Liquours, Inc. v. Centimark, Corp.*, 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007); *Giovo v. McDonald*, 791 So. 2d 38, 40 (Fla. 2d DCA 2001) ("Certainly, what is an 'essential term' of a contract differs according to circumstances. But, surely, it must include the terms specified in an offer to make a contract.").  Thus, while Florida law requires mutual assent on all essential terms, it is less clear what constitutes an essential term in any given transaction or proposed settlement.

In this case, while the underlying litigation involved factual allegations and legal issues of some complexity, the settlement negotiations between Kafka and the Bank were fairly straightforward and simple.  Notably, when the Bank rejected Kafka's initial offer and proposed its own counteroffer at a higher dollar amount, the sum of money that the Bank agreed to accept in settlement of its claims was the <u>only</u> term of the Bank's counteroffer.  *See* Davis' January 14, 2011 email to Kafka, stating "our consensus here is your offer is too low at $[redacted], we are willing to settle up at $[redacted]."  Upon receiving the Bank's counteroffer, Kafka called Davis and verbally accepted the Bank's counteroffer on January 18, 2011.  *See* Trial Transcript (Doc.

28

No. 200, p. 62) ("I called him up, I accepted that offer. I said, 'Okay, you have a settlement, let's get it done, get this behind us.' [Davis] agreed."). The next day, Kafka also memorialized his acceptance of the Bank's counteroffer when he wrote to Davis on January 19, 2011: "confirming our conversation of yesterday, we have agreed to settle the entire matter for the $[redacted] you proposed." Accordingly, Kafka agreed to pay a sum certain to the Bank in exchange for nearly two years of litigation finally coming to an end.

There is no evidence, and indeed the Bank does not argue, that its counteroffer had been rescinded or superseded by a different counteroffer at the time Kafka communicated his acceptance. Based on Kafka's response to Davis, it is clear that Kafka agreed to the only term proposed by the Bank: payment of the demanded sum of money. Nevertheless, the Bank argues that the settlement was not binding because (i) the necessary personnel within the Bank had not authorized or approved of the amount of the counteroffer and were still awaiting the results of certain due diligence inquiries; and (ii) Kafka's acceptance email on January 19 also included additional essential terms, including the requirement of a release and a dismissal of the lawsuit, to which the Bank did not agree. The Court will address each argument in turn.

### 1. Approval by the Credit Committee & Performance of Due Diligence

The Bank argues that Kafka's acceptance of its counteroffer was somehow ineffective due to the lack of final approval of the counteroffer by the Bank's credit committee. Davis testified at his deposition that while he had discussed the amount of the counteroffer with various individuals employed by the Bank, and that the consensus among those individuals was that the case should be settled for the amount offered to Kafka, there was still an "approving authority" or "committee process" that had not been completed with respect to the suit against Kafka. *See*

Davis Deposition Transcript (Doc. No. 205, pp. 60-61).  Florida law does not countenance this argument.

a.  <u>The Bank is liable for Davis' actions in communicating the counteroffer</u>

Under Florida law, a principal is liable for the acts of its agent under both express and apparent authority.  *Bhadelia v Marina Club of Tampa*, 142 Fed. Appx. 399 (11th Cir. 2005) (citing *Stiles v. Gordon Land Co.*, 44 So. 2d 417, 421 (Fla. 1950)).  "By apparent authority is meant, such authority as the principal wrongfully permits the agent to assume or which the principal by his actions or words holds the agent out as possessing." *Stiles v. Gordon Land Co.*, 44 So. 2d at 421.

In this case, there is no dispute that the Bank authorized Davis to negotiate with Kafka on its behalf in order to settle the litigation, or that Davis actually met with Kafka during his trip to Columbus to conduct such negotiations.  That trip was followed by numerous emails and telephone conversations between Kafka and Davis during the ensuing weeks, the sole purpose of which was to settle the litigation. There also is no dispute that Davis gave Kafka the impression that he had the authority, as the Bank's Vice President and long-time employee of its special asset division where he worked extensively with troubled, non-performing loans, to propose the counteroffer in question to settle the litigation. Indeed, when Kafka inquired whether Davis was authorized to "make a deal," Davis replied that he would run Kafka's offer "up the flagpole." Davis' ensuing counteroffer, therefore, was cloaked with apparent authority conferred upon him by Bank officials.  At a minimum, Bank officials were aware that Davis' settlement negotiations with Kafka were entering a critical stage, and wrongfully permitted him to assume a role (i.e.,

relaying an allegedly premature counteroffer) for which the Bank can now be held legally responsible under Florida law. *Stiles v. Gordon Land Co.*, 44 So. 2d at 421-22.

Here, the Bank does not base its repudiation of the settlement agreement upon any lack of authority in Davis to negotiate a settlement with Kafka on the Bank's behalf.  Nor does the Bank argue that Davis either lacked the authority to reject Kafka's initial offer or was not the appropriate person to relay a counteroffer to Kafka.  Rather, the Bank bases its repudiation on its contention that Davis' counteroffer—when made—had not been previously approved by the Bank's credit committee, as well as on the notion that the Bank had not completed its due diligence. As discussed below, however, those purported conditions were never disclosed to Kafka.  Accordingly, when Davis came back to Kafka with a counteroffer—after Kafka had expressly asked Davis whether he possessed authority to settle the litigation—Davis was acting with apparent authority.  Furthermore, the very fact that the Bank was performing due diligence and convening a meeting of its credit committee belies any assertion that the Bank was not seriously considering Kafka's offer and further serves to buttress the air of apparent authority on Davis' part to act for the Bank in communicating its counteroffer to settle the litigation. The Court concludes, therefore, that even though Davis may not have had the actual authority to relay the Bank's counteroffer to Kafka when he did, it would have been apparent and reasonable, as far as Kafka was concerned, to infer that Davis did possess authority to make the counteroffer and settle the litigation on the Bank's behalf.  Accordingly, under the circumstances, when Davis made the counteroffer to Kafka, he did so as an agent for the Bank, imbued with apparent authority.  The Bank, as principal, is liable for its agent's acts.

### b.    Acceptance by Kafka of the Bank's unconditional counteroffer

Having determined that the Bank is liable for Davis' action, we next turn to the ultimate question of whether the parties reached an enforceable settlement agreement in this case.   In Florida, courts use an objective test to determine whether the parties have reached an agreement. *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985).   Under that test, "[t]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs-not on the parties having meant the same thing but on their having said the same thing."   *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Financial Corp.*, 302 So. 2d 404, 407 (Fla. 1974) (internal citation omitted).   In other words, one party to a settlement is not required to be a mind reader or to know the private thoughts or intentions of the other party; rather, the parties need only agree on what they have actually said or expressed to each other.

In this case, it is undisputed that there was no email or other communication between Kafka and Davis in which Davis informed Kafka that additional approval would be required before the counteroffer could be accepted or before the settlement would be effective.   In fact, Davis conveyed quite the opposite impression when he told Kafka—after Kafka asked whether he was authorized to "make a deal"—that he would run Kafka's offer "up the flagpole."   Kafka was perfectly justified in believing that when Davis responded to his initial offer with a counteroffer, the appropriate personnel had been consulted.   And, as noted, even if Davis lacked actual authority to present Kafka with the counteroffer, the Bank is nevertheless liable under Florida law for the counteroffer relayed to Kafka because of the unrestrained apparent authority Davis wielded in the negotiations.

32

These circumstances stand in stark contrast to the facts in *Southern Internet Systems, Inc. ex rel. Menotte v. Pritula*, 856 So. 2d 1125 (Fla. 4th DCA 2003).  In that case, the settlement agreement contained an express condition precedent that the board of directors of one of the settling parties approve the agreement.  When no such approval was obtained, the court held that the agreement was never fully formed and thus did not come to fruition.  In contrast to *Pritula*, the Bank here simply countered Kafka's original offer.  When Kafka accepted the Bank's counteroffer, there was an agreement on the external sign (i.e., the requisite amount it would take to settle the suit).  Unlike *Pritula*, there was no indication that the Bank's credit committee had to approve the settlement as a condition precedent to its existence. Whether Davis and the Bank intended for the counteroffer and the ultimate settlement to be subject to other conditions is irrelevant, as those conditions were never disclosed to Kafka.

The Bank also argues that no settlement was reached because it had not completed its due diligence at the time Kafka accepted its counteroffer.  The Bank asserts that it was misled into making an unjustifiably low counteroffer: a realization it discovered as a result of its due diligence.  In arguing that no agreement had been reached, the Bank relies on the emails to Kafka in which Davis first informed him that the Bank was in the process of conducting its due diligence, and then later told him that the ultimate results of the due diligence did not warrant settlement at the amount previously offered.  *See* Davis' email to Kafka disclaiming the previously agreed settlement ("after conducting our due diligence, we cannot settle these disputes at this time").

The Bank cannot escape the settlement on the basis of its own dilatory due diligence.  The Bank's due diligence came too late; Kafka had already accepted the Bank's counteroffer by the time Davis mentioned the ongoing due diligence efforts.  Like the credit committee approval

discussed above, there is no evidence that the Bank's counteroffer was conditioned upon the results of any due diligence or background searches.  Without such a condition being stated, any attempt to make the due diligence a term or condition of the settlement is futile.

According to Davis' deposition testimony, the Bank's standard operating procedure was to conduct due diligence *after* making an offer to settle the litigation.  *See* Davis Deposition Transcript (Doc. No. 205, p. 64) ("usually when an offer is made that's when we do our due diligence on it").  The Court is befuddled as to why the Bank would wait to commence due diligence until after its Vice President had already made a counteroffer to settle the litigation on its behalf.  The very concept of due diligence connotes an effort that should be undertaken in advance of any firm offers being made.  For whatever reason, the Bank chose not to follow this common sense sequence of events.  Indeed, the first mention of any due diligence at all came on January 28, 2011, two weeks after Davis had relayed the Bank's counteroffer to Kafka and ten days after Kafka had accepted the counteroffer.

According to the Bank, the due diligence was precipitated by alleged representations (or, as the Bank characterizes them, misrepresentations) made by Kafka to Davis during the course of the settlement negotiations.  Davis testified at his deposition that during his meeting in Columbus with Kafka in early November 2010, Kafka told Davis that Kafka had limited financial resources, that he was living only on social security benefits, and that one of the buildings he owned (and, presumably, which the Bank would be able to execute on in satisfaction of any future judgment it obtained against Kafka) was under water.  *See* Davis Deposition Transcript (Doc. No. 205, pp. 65-66).  Essentially, Davis' impression from his conversation with Kafka was that Kafka was uncollectable.  This understanding presumably served as the underlying reason for the Bank's willingness to resolve the litigation for a relatively low sum.  Based on the

eventual due diligence results, however, the Bank subsequently learned that Kafka was not uncollectable and that the building Kafka owned was not under water. Instead, it was completely unencumbered. While this knowledge explains the Bank's attempt to renege on its deal, such an attempt must fail because the parties had already reached a settlement.

Notably, Kafka's trial testimony controverts Davis' deposition testimony. Kafka testified at trial on April 13, 2012 that he did <u>not</u> tell Davis that his only source of income was social security; that he was generally uncollectable; or that the property was under water. *See Trial Transcript* (Doc. No. 202, pp. 53-54). The Court need not resolve the inconsistencies between Davis and Kafka's testimony because what is undisputed is the fact that Davis never memorialized in any of his emails with Kafka that the Bank's offer was (i) subject to the results of its due diligence or the accuracy of the alleged representations concerning Kafka's financial status; or (ii) contingent on some other undisclosed factor. Davis never requested any financial affidavits, statements or other documentation from Kafka that would evidence his general financial status or collectability. Moreover, the Bank could easily have ascertained the ownership of the property in question, as well as any existing encumbrances, through a public records search or title report. Simply put, any information that the Bank deemed necessary in order to evaluate Kafka's offer and engage in worthwhile settlement negotiations could—and should—have been obtained prior to making an unconditional counteroffer to Kafka. The Bank had over two months to perform whatever due diligence it deemed necessary as a result of Davis' early November 2010 meeting with Kafka. The fact that there are no conditions or qualifications attached to the Bank's counteroffer precludes the Bank from rescinding its counteroffer after Kafka had already accepted it.

In sum, under Florida law, a settlement can exist when the parties agree on two sets of external signs. *Blackhawk*, 302 So. 2d at 407. Such an agreement was reached here. Whatever may have been transpiring in one party's mind is irrelevant if not communicated to the other party. *Id.* Under the objective test adopted by Florida courts, a party's mental reservations or unexpressed intentions simply cannot override outward expressions of assent. The Court must give credence to the objectively manifested intentions of the parties. With these legal principles in mind, the Court is unable to comprehend how else it ought to read the Bank's counteroffer that it was willing to "settle up" at its proposed dollar amount. Thus, when Kafka accepted the Bank's counteroffer, a settlement was reached, regardless of the Bank's ongoing—and undisclosed—efforts to verify certain information.

2. *The Additional Paperwork Referenced by Kafka*

The Bank also argues against the existence of an enforceable settlement on the basis that there was no mutual agreement on all essential terms. The Bank asserts that Kafka's January 19 acceptance email did not constitute an unequivocal acceptance of its counteroffer, but was, instead, conditioned on the execution of additional documents before the settlement would become effective.

Specifically, the Bank relies on Kafka's reference to other "documents for [him] to review and sign and forward to [Bank] with the check." Those other documents, as Kafka explains in the next paragraph of his January 19 acceptance email, included a "withdrawal of the complaint" and a mutual release. *See* Kafka's email to Davis (referring to a release "for us to sign") (emphasis supplied). The Court must determine whether Kafka's contemplation that (i) the parties would sign a release; and (ii) the Bank would dismiss its lawsuit against him were

essential terms of the settlement, or whether those items were merely ancillary documents that would implement and effectuate the settlement.

### a. Release as an Essential Term

Several Florida courts have held that a release constitutes an essential term of a settlement, such that the parties' disagreement over specific language contained within the release or the overall scope of the release precluded a finding of an enforceable settlement.[15]  Those cases are distinguishable, however, as the facts leading to the holdings in those case are not present here. For example, there is no evidence that the parties disputed whether a release would even be provided in the first place.  To the contrary, the parties' emails establish that the Bank agreed to draft the release and send it to Kafka.  Nor is there any evidence in this case that the execution of a specific version of a release was a condition precedent to the settlement coming into existence.

Moreover, in each of the distinguishable Florida cases, the parties either (i) were engaged in active negotiations over the content, language, and scope of the proposed releases; or (ii) had expressly voiced objections to the proposed releases.  None of those facts exist here.  While Kafka indicated a desire to obtain a release from the Bank, it is clear that the release was to be mutual, with both parties signing it.  There was no requirement that the release contain certain, specific language or additional terms in order to make his acceptance of the Bank's offer effective.  In fact, the emails between Kafka and Davis indicate that it was Kafka who was

---

[15] *See, e.g., In re Cheverie v. Geisser*, 783 So. 2d 1115 (Fla. 4th DCA 2001) (holding that objection to proposed indemnification language contained in the release precluded finding that settlement had been reached); *Nichols v. Hartford Ins. Co. of the Midwest*, 834 So. 2d 217, 219 (Fla. 1st DCA 2002) (finding that parties' active negotiation over the indemnification clause contained within the release made release an essential term, and because parties never agreed on the indemnification clause, they had not reached a settlement); *Bateski By and Through Bateski v. Ransom*, 658 So. 2d 630 (Fla. 2d DCA 1995) (holding that one party's failure to execute the specific release sent to the other party precluded a finding of settlement where settlement was conditioned upon execution of the release); *Gaines v. Nortrust Realty Management, Inc.*, 422 So. 2d 1037 (Fla. 3d DCA 1982) (holding there was no settlement where parties disagreed on whether release would be narrowly tailored to specific dispute, or whether a broad general release would be provided).

relying on the Bank's in-house counsel to prepare and provide the release (as opposed to Kafka preparing the release and demanding that the Bank sign his version before the settlement would become effective).  Kafka's acceptance was in no way conditioned on a specific version of a release being provided.

Furthermore, a mere reference to a release does not necessarily make the release an essential term of the settlement.  In fact, several courts have held otherwise.  The Florida Supreme Court has stated that parties to a settlement need not account for every contingency in order for an enforceable settlement to exist. *See Robbie v. City of Miami*, 469 So. 2d at 1385.  Here, the reference to a release, which was agreed upon but never provided, will not serve to defeat or frustrate the settlement the parties reached.  This Court must remain mindful of its role in adjudicating this dispute, as directed by the Eleventh Circuit Court of Appeals.  *See Schwartz*, 807 F.2d at 905 (noting that a court's role in determining whether an enforceable settlement exists is to interpret the parties' intentions and the objects to be accomplished in light of the circumstances prevailing at the time).  Charged with that task, and considering the circumstances surrounding Kafka's negotiations with Davis and the Bank, the Court is convinced that Kafka's mention of a release did not render the release an essential term of the settlement.  Rather, the release was to serve as a procedural formality which would facilitate a final resolution to the litigation that had been pending for over two years, and which had cost both parties substantial sums of money.

The Court's conclusion that the release was not an essential term of the settlement is buttressed by the decisions of those courts which have held in similar circumstances that the mere reference to a release does not necessarily make the release an essential term.  *See Sands v. Wagner & Hunt, P.A.*, 2009 WL 2730469, *4, n. 7 (S.D. Fla. Aug. 28, 2009) (the "suggestion

that settlement was contingent upon the drafting of a release is unavailing; the release would have merely memorialized the essential terms to which the parties had previously agreed"); *McDonnell v. Engine Distributors*, 2007 WL 2814628, *8 (D. N.J. Sept. 24, 2007) (holding that the scope of a release is not an essential term of a settlement but rather goes to the settlement's implementation); *Allapattah Servs., Inc. v. Exxon Corp.*, 2007 U.S. Dist. LEXIS 71379, at *18 (S.D. Fla. Sept. 26, 2007) (finding a release to be a non-essential term of the settlement agreement, as it "merely reflects the binding and conclusive effect of the agreement in the claims process").  This Court concludes, consistent with the foregoing cases, that the release would simply document the Bank's receipt of the settlement money (*see* Kafka's January 27 email) and represent the finality of the litigation.

The Court's conclusion is not altered by the fact that Kafka requested the Bank to prepare the release and to send it to him for his review.  Kafka emailed Davis on January 19, 2011, stating: "confirming our conversation of yesterday, we have agreed to settle the entire matter for the $[redacted] you proposed."  That statement constitutes and reflects Kafka's unequivocal assent to the Bank's counteroffer.  *See Sands v. Wagner & Hunt, P.A.*, 2009 WL 2730469, at *3 (noting that the statement "[defendants] accept your offer" in an email sufficiently established unequivocal assent).  The remainder of Kafka's January 19 acceptance email, including his reference to a release, is directed toward the manner in which the settlement would be implemented.  *See id.* at *4; *see also Romacorp, Inc. v. Prescient, Inc.*, 2011 WL 1430277, *5 (S.D. Fla. Apr. 14, 2011) (rejecting the argument that an email request from one party to the other to "[p]lease have the appropriate documents prepared and delivered to me for review" negated the party's unconditional acceptance of the offer).

A simple request to review the release does not necessarily transform the release into an essential term.  There is no evidence that the release itself was a contested or negotiated issue.  In fact, Kafka's January 19 acceptance email indicates that the Bank agreed to prepare the release and provide it to Kafka.  *See* Plaintiff's Exhibit # 71 (Kafka to Davis: "Just checked my email for today at 4 pm and had no email concerning the documents for me to review and sign and forward to you with the check.").  Accordingly, the Court concludes that Kafka's request for a release was a mere procedural formality to accompany the settlement check and to resolve the pending litigation which had been ongoing for over two years.

Moreover, the fact that the release was never actually drafted and sent to Kafka does not preclude a finding of settlement.  *See Patrick v. Christian Radio*, 745 So. 2d at 580 (holding that settlement had been reached even though release had not yet been signed); *Calderon v. J.B. Nurseries, Inc.*, 933 So. 2d 553, 555 (Fla. 1st DCA 2006) (holding that one party's refusal to sign a release does not allow that party to escape the binding effect of the settlement agreement); *Dania Jai-Alai Palace, Inc. v. Sykes*, 495 So. 2d 859 (Fla. 4th DCA 1986) (holding that enforceable settlement existed notwithstanding disagreement over form of release and absence of signed release).

Finally, even if the settlement was subject to or contingent upon the provision of a release to Kafka, the Court finds—based on the evidentiary record—that the Bank agreed to prepare and provide a release to Kafka.  As noted above, Kafka's January 19 acceptance email summarized Kafka's oral discussion with Davis from the previous day.  The email clearly indicates that Kafka and Davis discussed the Bank's provision of a release, and further reveals that the Bank would be drafting the release.

Kafka's subsequent emails to Davis further substantiate this agreement.  When Kafka made repeated inquiries concerning when the release would be provided,  Davis' responses acknowledged that the Bank was in the process of preparing and providing the release to Kafka. For example, after Kafka asked Davis for an estimate of "when the paperwork moves," Davis responded that his "[a]ttorney is out today, I'll get a fix tomorrow."  Similarly, after another inquiry as to the status of the paperwork, Davis replied that he was "talking with the attorney this afternoon," suggesting that the Bank's in-house counsel was working on preparing the release and that the Bank would be in touch with Kafka shortly.

At no time until his final email to Kafka attempting to renege on the agreement did Davis ever object to the provision of a release or attempt to memorialize a different understanding of the deal he and Kafka had made.  Therefore, even if the release can be deemed an essential term, the Court finds that the Bank assented to that term and agreed to provide the release to Kafka. *See In re Sav-A-Stop, Inc.*, 124 B.R. at 359 (holding that an enforceable settlement had been reached where certain details of the settlement were "later agreed to by the parties" and that the parties' oral agreement on those details was sufficient).

b.  Dismissal of the Lawsuit

The same reasoning articulated above with respect to the release applies to the Court's finding that Kafka's mention of a dismissal of the lawsuit does not render the dismissal an essential term of the settlement.  Instead, it was merely a means of implementing the agreement that had already been reached.  The filing of a dismissal with this Court would have been a "procedural formality" that accomplished and effectuated the underlying agreement to settle the lawsuit. *See Boyko v. Ilardi*, 613 So. 2d at 104.  As noted in *Security Professionals, Inc. By and*

*Through Paikin v. Segall*, 685 So. 2d 1381, 1383 (Fla. 4th DCA 1997), a settlement, by definition, concludes all claims unless the settlement agreement specifies otherwise. Here, there is no evidence that less than all claims were being settled or that settlement would not be effective or enforceable until a formal dismissal was filed with the Court. Therefore, once Kafka accepted the Bank's counteroffer, the settlement was reached, thereby resolving all claims. In sum, the dismissal would have simply served as the means of formally closing the case and effectuating the settlement.

As noted previously, in determining whether a binding settlement has been reached, the Court's role is to ascertain the intention of the parties from the language of the agreement, the apparent objects to be accomplished, other provisions in the agreement that may cast light on the question, and the circumstances prevailing at the time of the agreement. *Schwartz*, 807 F.2d at 905. Here, the emails between Kafka and Davis embodied the settlement. The obvious object to be accomplished was a full and final resolution to the litigation. Moreover, it is clear that Kafka was not engaged in negotiations over the form of the dismissal or the specific language to be included. He was simply looking for an end to the litigation in a timely fashion so that he did not have to hire a new law firm to continue to represent his interests. Indeed, the emails reflect—and Kafka's trial testimony corroborates—his understanding that the Bank was the party preparing the dismissal. Rather than battling the Bank over the precise language of the dismissal and other legal nuances, such as whether the dismissal would be with or without prejudice, Kafka simply wanted the lawsuit to conclude. A dismissal serves as the procedural mechanism by which that goal is accomplished.

Finally, as with the release, even if the dismissal can be deemed an essential term of the settlement, the Court finds—based on the evidentiary record—that the Bank agreed to dismiss its

claim in exchange for payment from Kafka.  As noted above, Kafka's January 19 acceptance email clearly indicates that Kafka and Davis discussed the Bank's dismissal of its claims. Kafka's subsequent emails to Davis further substantiate this agreement.  As with the release, when Kafka repeatedly asked about "the status of the paperwork" and "when the paperwork moves," Davis' responses suggested that the Bank was in the process of preparing the dismissal. At no time until his final email to Kafka did Davis ever inform Kafka that the Bank would not implement the settlement by filing the dismissal.

The only logical explanation for why the Bank stalled on providing the agreed-upon release and dismissal to Kafka was that it was either awaiting the results of its due diligence or contemplating internally how to disavow the settlement that had already been reached.  As discussed above, though, Kafka had already accepted the Bank's unconditional counteroffer. The Bank's subsequent attempt to dishonor the settlement must fail.  In fact, as the email exchange clearly reflects, even as the due diligence process was presumably ongoing, Davis had communicated to Kafka that he was working with his in-house counsel on drafting the necessary paperwork to implement and effectuate the settlement.  Therefore, even if the dismissal can be deemed an essential term, the Court finds that the Bank assented to that term and agreed to dismiss its claims against Kafka in exchange for Kafka's payment of the settlement amount.

## Conclusion

Kafka and the Bank, through Davis, reached an enforceable settlement.  Davis' and Kafka's email correspondence memorializes their conversations and agreement and establishes that Kafka and the Bank mutually assented to the terms of the settlement.  The Bank extended a counteroffer, which Kafka accepted.  No conditions were attached to that counteroffer or

expressed to Kafka, even if the Bank privately believed that such conditions existed. Furthermore, regardless of whether Kafka's mention of a release and dismissal are essential or non-essential terms, the parties' email exchange reveals that the Bank agreed to provide those documents to Kafka.    Accordingly, the settlement is sufficiently specific to be capable of implementation.  *In re Sav-A-Stop, Inc.*, 124 B.R. at 359.

Here, the implementation of the settlement is easily accomplished.  Kafka is directed to transfer the agreed-upon sum to the Bank.  Upon receipt of the settlement funds, the Bank is directed to (i) provide Kafka with a mutual release, pursuant to which each party will release the other of liability for the claims brought in this proceeding; and (ii) file a stipulation of dismissal of its claims, with prejudice, under Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7041 of the Federal Rules of Bankruptcy Procedure.  If the Bank fails to comply with the terms of this Order, then Kafka may move for an involuntary dismissal of the Amended Complaint and all the claims asserted therein under Rule 41(b) of the Federal Rules of Civil Procedure.  The Court will then enter a separate judgment consistent with this opinion in favor of Kafka and dismissing the Bank's claims.

Dated: August 22, 2012

BY THE COURT

_____
Jeffery P. Hopkins
United States Bankruptcy Judge